### AFFIDAVIT OF ANTHONY J. ROBERTO

I, Anthony J. Roberto, being duly sworn, do depose and say:

1.  I am a Special Agent of the Drug Enforcement Administration ("DEA"), United States Department of Justice, and have been so employed since 1980.  I currently am assigned to the New England Field Division of the DEA.  During the course of my law enforcement career, I have participated in over one hundred criminal investigations involving drug trafficking, including the execution of arrest warrants and search and seizure warrants.

2.  I previously have participated in investigations relating to the distribution and sale of controlled substances such as cocaine, cocaine base ("crack"), heroin, and marijuana.  I have also participated in various aspects of investigatory work, including conducting surveillance, debriefing informants, and acting in an undercover capacity.  I have participated in over 100 narcotics-related arrests and the execution of dozens of narcotics-related search warrants.  I also have received training at the DEA Academy concerning narcotics trafficking and money laundering and have participated in investigations involving the laundering of narcotics proceeds.  I have provided instruction to state and other federal law enforcement officers regarding enforcement of narcotics laws.  I have been qualified to

testify as an expert in United States District Courts regarding narcotics.

3.  This affidavit is submitted in support of an application for a criminal complaint against Steven IMMERGLUCK ("IMMERGLUCK").  I am participating in an investigation into the distribution of controlled and non-controlled prescription medications being distributed by Meetinghouse Community Pharmacy, Inc., in Dorchester, Massachusetts. This investigation involves agents of the DEA, Federal Bureau of Investigation, Department of Health and Human Services, the United States Postal Inspection Service, and the Food and Drug Administration.  This affidavit is based upon my own personal knowledge, as well as information provided by other agents involved in this investigation. Because this affidavit is submitted for the limited purpose of obtaining a complaint against IMMERGLUCK, I have not included each and every fact known to me and to other law enforcement officers working in this investigation. Instead, I have included only those facts which I believe are necessary to establish the existence of probable cause to support the requested criminal complaint.

4.  Based on this investigation, I have learned that STEVEN IMMERGLUCK is an individual living in Aurora, Illinois.  At the time that this investigation began, IMMERGLUCK was an

employee of Freight Savers Express, a subcontractor of DHL, which regularly shipped packages for Global Access, S.A. (Global Access), which operated several online pharmacy websites.  Freight Savers Express is located at 1229 W. Randolph Street, 2nd Floor, Chicago, Illinois.  Freight Savers Express also does business under the names "Office Everything" and "Freight Ready."

5.    As described below, there is probable cause to believe that, from in or about September 2006 through in or about November 2008, IMMERGLUCK knowingly and intentionally conspired to distribute controlled substances, in violation of Title 21, United States Code, Section 846, by shipping or facilitating the shipping of medications interstate that were ordered through illegal online pharmacy websites operated by Global Access and dispensed by pharmacies, including, but not limited to, Meetinghouse Community Pharmacy in Dorchester, Massachusetts, without valid prescriptions to customers across the United States.

**The Applicable Statutes**

6.    The Controlled Substance Act ("CSA"), 21 U.S.C. § 801, *et seq.*, created a closed system of distribution for pharmaceutical drugs classified as controlled substances because of their potential for abuse.  Drugs covered by the CSA are placed in one of five schedules, based on their

3

abuse potential and their legitimate medical uses.  Title 21, U.S.C. § 841 makes it unlawful to manufacture, distribute, dispense or possess controlled substances, unless authorized by the CSA and its regulations.

7.    Both drugs covered by the CSA in Schedules I-V and non-controlled drugs (which are sometimes referred to as Schedule VI), need prescriptions in order for them to be dispensed to patients.  Physicians who wish to prescribe controlled substances and pharmacists who wish to dispense controlled substances must be registered with the DEA.  For a prescription of a controlled substance to be effective, it must comply with 21 C.F.R. § 1306.04(a).  This section provides as follows:

> A prescription for a controlled substance to be effective must be issued for a legitimate medical purpose by an individual practitioner acting in the usual course of his professional practice.  The responsibility for the proper prescribing and dispensing of controlled substances is upon the prescribing practitioner, but a corresponding responsibility rests with the pharmacist who fills the prescription.

8.    An order purporting to be a prescription not issued in the usual course of professional treatment or in legitimate and authorized research is not a prescription within the meaning and intent of section 309 of the CSA (21 U.S.C. § 829) and the person knowingly filling such a prescription, as well as the person issuing it, shall be subject to the penalties

4

provided for violations of the provisions or law relating to controlled substances.  In addition, a physician and/or a pharmacist and other individuals may also be subject to the penalties provided by the Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 333, for distribution of misbranded drugs.  21 U.S.C. § 331 (a); 21 U.S.C. § 353(b)(1).

9.    DEA regulations do not authorize electronic transmission of prescriptions from a prescriber to a pharmacy.  If a pharmacy receives prescription information for a Schedule III-V controlled substance over the Internet, the pharmacy must contact the prescriber by telephone and receive a verbal prescription for the drug and then reduce this to writing.  The verbal prescription must include the full name and address of the patient, the drug name, drug strength, dosage, form, quantity prescribed, directions for use and the name, address, and DEA registration number of the prescribing physician.  See 21 C.F.R. § 1306.5(a).

10.   The Federal Food, Drug, and Cosmetic Act (the "FDCA"), which is codified at 21 U.S.C. §§ 301-397, prohibits, "the introduction or delivery for introduction into interstate commerce of any food, drug, device or cosmetic that is adulterated or misbranded."  21 U.S.C. § 331(a).

11.   The FDCA, 21 U.S.C. § 353 (b)(1), defines a prescription drug as follows:

5

A drug intended for use by man which—

>   (A) because of its toxicity or other
>   potentiality for harmful effect, or the
>   method of its use, or the collateral measures
>   necessary to its use, is not safe for use
>   except under the supervision of a
>   practitioner licensed by law to administer
>   such drug; or
>
>   (B) is limited by an approved application
>   under section 505 to use under the
>   professional supervision of a practitioner
>   licensed by law to administer such drug;
>   shall be dispensed only (i) upon a written
>   prescription of a practitioner licensed by
>   law to administer such drug, or (ii) upon an
>   oral prescription of such practitioner which
>   is reduced promptly to writing and filed by
>   the pharmacist, or (iii) by refilling any
>   such written or oral prescription if such
>   refilling is authorized by the prescriber
>   either in the original prescription or by
>   oral order which is reduced promptly to
>   writing and filed by the pharmacist. The act
>   of dispensing a drug contrary to the
>   provisions of this paragraph shall be deemed
>   to be an act which results in the drug being
>   misbranded while held for sale.

12.  The FDCA requires that prescription drugs be dispensed only

on a prescription from a "practitioner licensed by law to

administer such drug." 21 U.S.C. § 353(b)(1). Therefore, a

pharmacist acts in violation of the FDCA when he or she

dispenses prescription drugs not pursuant to a valid

prescription. The prescription drugs dispensed pursuant to

such a prescription are "misbranded" under the FDCA.

Therefore, prescriptions from a physician acting outside of

the usual course of professional practice or not for a

6

legitimate medical purpose, or prescriptions that are
electronically transmitted to the pharmacy and are not
reduced to writing from verbal orders, are not valid
prescriptions and are not authorized by the CSA.  Any
pharmacist who fills a prescription for controlled
substances knowing that the prescription is invalid is also
criminally liable under the CSA and FDCA.

13.  The law of the Commonwealth of Massachusetts regarding
Internet prescribing provides in pertinent part:

> A prescription for a controlled substance to
> be valid shall be issued for a legitimate
> medical purpose by a practitioner acting in
> the usual course of his professional practice
> . . . An order purporting to be a
> prescription issued not in the usual course
> of professional treatment or in legitimate
> and authorized research is not a prescription
> within the meaning and intent [of this act].

Mass. Gen. Laws, c. 94C, § 19(a).  The statutory language
sets forth the minimum requirements that must be met in
order for a prescription to be valid in Massachusetts.

14.  Likewise, Illinois law states the following:

> A prescription for a controlled substance to
> be effective must be issued for a legitimate
> medical purpose by an individual practitioner
> acting in the usual course of his
> professional practice.  The responsibility
> for the proper prescribing and dispensing of
> controlled substances is upon the prescribing
> practitioner, but a corresponding
> responsibility rests with the pharmacist who
> fills the prescription.  An order purporting
> to be a prescription within the meaning and

7

> intent of Paragraphs 1308-1312 of the
> [Illinois Controlled Substances] Act and the
> person knowingly filling such a purported
> prescription as well as the person issuing
> it, shall be subject to the penalties
> provided for violations of the provisions of
> law relating to controlled substances.

77 Ill Adm. Code 3100.380(a).

15. Pursuant to Massachusetts law and policy, which is
consistent with Illinois law and policy, in order to satisfy
the requirement that a prescription be issued by a
practitioner in the usual course of his professional
practice, there must be a physician-patient relationship
that is for the purpose of maintaining the patient's well-
being.  The physician must conform to certain minimum norms
and standards for the care of the patients, such as taking
an adequate medical history and conducting an appropriate
physical and/or mental status examination and recording the
results.  Issuance of a prescription, by any means,
including the Internet or other electronic process, that
does not meet these requirements, is unlawful.

**Background of the Investigation**

16. The investigation in the District of Massachusetts centers
on Meetinghouse Community Pharmacy, Inc., ("Meetinghouse")
located at 248 Bowdoin Street, Dorchester, Massachusetts.
Meetinghouse was owned and operated by Baldwin Ihenacho, a
Registered Pharmacist, who ran Meetinghouse with the

8

assistance of his wife and several other employees. Gladys
Ihenacho is a Registered Nurse licensed by the Commonwealth
of Massachusetts.  Both Baldwin and Gladys Ihenacho were
charged in an Indictment with two counts of Conspiracy to
Distribute Controlled Substances, in violation of 21 U.S.C.
§ 846, and ten counts of Distribution of Controlled
Substances, in violation of 21 U.S.C. § 841.  The vast
majority of prescriptions dispensed from this pharmacy were
filled by way of the Internet transactions and shipped,
usually interstate *via* private express carriers, to
customers who did not visit the pharmacy (or a doctor) in
person.

17. During the course of this investigation, agents learned that
Ihenacho regularly communicated with a website operator
named Palasy Hernandez Hernandez (also known as "Jack"
Palasy), President of Global Access, S.A., who operated
several illegal Internet pharmacies based out of the
Dominican Republic and sent the drugs ordered throughout the
United States.  Palasy operated several websites where
customers could log on to purchase controlled substances
without a prescription or a valid patient-doctor
relationship.  Palasy, among others, recruited both doctors
and pharmacies to participate in his operation.  Palasy
recruited, and then agreed with, Ihenacho that prescription

9

orders obtained through Palasy's websites would be dispensed by Meetinghouse.  The staff at Meetinghouse downloaded patient information and orders, as well as DHL shipping labels, and sent the drugs ordered to the customers.  DHL employees picked up the packages from Meetinghouse and delivered them to the Internet pharmacy customers.  Palasy paid Meetinghouse by wiring deposits into bank accounts designated by Ihenacho.

18.  In the course of this investigation, agents obtained information from a DEA Diversion Investigator (D/I) in Nashville, Tennessee, indicating that Meetinghouse Community Pharmacy was engaged in the illegal sale of controlled substances via the Internet.  According to the D/I, on April 19, 2007, an individual, "A.T.", a customer of the Medical Consulting Group, placed a call to an undercover pharmacy ("River City RX"), in the State of Tennessee to find out when her order of Didrex, a Schedule III controlled substance, would be shipped.  "A.T." informed the agent acting in an undercover capacity as a pharmacist that she had her last prescription filled at Meetinghouse.  When asked, "A.T." informed the undercover agent that she did not know the doctor listed on her prescription.

19.  Acting on this and other information, I and other agents learned that Meetinghouse shipped approximately 4,000

packages via DHL Express Mail (DHL) per month.  From in or about September 2006 to on or about November 1, 2008, Meetinghouse had at one time or another shipped packages to all 50 states.

**Distribution by IMMERGLUCK and DHL**

20.  Other agents and I reviewed email communications among Ihenacho, Palasy, and IMMERGLUCK and others, that were sent between in or about September 2006 and in or about September 2008.  The e-mails showed that Jack Palasy was the President of Global Access, S.A., and that Steve IMMERGLUCK worked for Freight Savers Express and/or Freight Ready in Chicago, Illinois.  Freight Savers Express was a reseller of tracking numbers and/or an agent for DHL. IMMERGLUCK and Palasy worked together to ship to their customers' drug orders filled via Palasy's Internet pharmacy operation, including those filled by Meetinghouse Community Pharmacy, to the customers via DHL Express Mail.

21.  In or about August 2006, IMMERGLUCK set up a DHL account for Palasy's Internet pharmacy operation and registered Palasy for DHL shipping services.  Palasy received a DHL system ID and password.  IMMERGLUCK also set up waybills, which would contain the addresses of the customers to whom the packages of drugs were sent, the billing system between DHL (through Freight Savers) and Palasy, and the DHL shipping labels that

11

would be needed by the dispensing pharmacy and that would be
placed on the packages containing the Internet drug orders.
In return, Palasy indicated in his email that he had made a
$5,000 deposit on the Global Access DHL account on or about
September 15, 2006.

22. Through email communication between IMMERGLUCK and Palasy, I
learned that IMMERGLUCK also recruited pharmacies to
dispense medications for Palasy's websites.  On or about
September 11, 2006, IMMERGLUCK sent "three pharmacy
contacts" to Palasy.  One of those pharmacies was
Meetinghouse Community Pharmacy, 248 Bowdoin Street,
Dorchester, Massachusetts.  IMMERGLUCK indicated that
Baldwin Ihenacho was the contact person at Meetinghouse.  It
appears from this email, and the written conversation that
followed, that IMMERGLUCK introduced these three pharmacies
to Palasy so that Palasy could call and recruit them to
dispense Internet drug orders.  Palasy later reported to
IMMERGLUCK that one pharmacy "w[ould] not take olp," which I
understand to mean "online pharmacy."  A few days later, on
or about September 25, 2006, Palasy and IMMERGLUCK confirmed
that IMMERGLUCK had set up an account for Meetinghouse
Pharmacy, and that "they," meaning Meetinghouse, "should
already have supplies except for the sticky [DHL mailing]
labels, which I'll send today.  When are you starting with

them?"  On September 27, 2006, IMMERGLUCK further confirmed that he had received $5,000 from Palasy by wire as a deposit with Freight Savers, and that distribution from Meetinghouse would begin soon.  That same day, Ihenacho sent an email to Palasy, stating the following:

> Hello, Jack.  I did not see any DHL drivers today to pickup orders.  A gentleman at DHL called me on Monday and stated that he will have the drivers, generally, between three and four p.m., Monday throught Friday. Please, call him and remind him of this.  It is best for the drivers to come at 3:30 p.m., Monday through Friday.[1]

23.  On September 26, 2006, Steve IMMERGLUCK e-mailed Jack Palasy and asked, "Are you starting with Baldwin today?  Am I getting a referral fee per script filled with Baldwin?" Palasy responded to IMMERGLUCK via e-mail, "yes we start yesterday with baldwin";  "and yes you get you fee also." Approximately three days later, IMMERGLUCK wrote to Palasy that he had spoken to an employee at Meetinghouse Pharmacy "and she understands how we need the packages sent.  She did get the sticky labels and I order her 1,000 small padded envelopes."

24.  On October 10, 2006, Palasy e-mailed IMMERGLUCK from his g-mail account with a copy to Ihenacho's AOL account and attached a spreadsheet containing approximately 142

---

[1] For accuracy, I am reporting the e-mails as written, including any typographical errors.

prescription orders with customer names and DHL tracking numbers.  Palasy asked IMMERGLUCK and Ihenacho to update him on the status of the orders.  In another e-mail of this date, Ihenacho questioned Palasy (not for the first time) about the fact that only one doctor was authorizing all of the prescription orders that he was shipping.  Based upon the content of the e-mails between Ihenacho and Palasy, the estimated number of orders shipped when they began doing business was approximately 70 orders per day, more or less; by the end of October, 2006, this number had increased to 120 orders per day.

25.  Attached to many of those emails between Steven IMMERGLUCK and Jack Palasy (and other Global Access employees), for the period September 2006 through September 2008 were invoices from Freight Savers Express to Global Access for DHL packages that were picked up from various pharmacies across the country, including Meetinghouse Pharmacy.  These invoices contained customer names, customer mailing information, the amount charged for shipping each package, and the sender's address, as well as the pharmacy from which it was sent.  For packages shipped from Meetinghouse, they indicated that they were "sent by Meetinghouse Community Pharmacy, Jack Palasy, 248 Bowdoin St., Dorchester, Massachusetts."  These invoices revealed that between

September 2006 and September 2008, at least 89 invoices were billed from Freight Savers Express directly to Meetinghouse Pharmacy and/or Global Access.  The vast majority of the invoices were for packages sent from Meetinghouse.   The invoices accounted for 35,075 air bills (individual packages sent), totaling $474,703.70 in base shipping charges without late fees.  A review of the shipping data in the invoices indicates that dates/weeks that shipments are known to have been sent are not accounted for - indicating that there may be additional invoices that are missing.

26. The emails also included communications regarding wire transfers made in payment for the invoiced air bills.  These wire transfers were made from a Banco Popular Dominicano account held by Global Access to a Citizens Bank account held by Freight Savers.  Based on an analysis of the wire transfer confirmations attached to the emails, and the corresponding bank records, I have learned that between September 2006 and April 2008, Global Access sent at least 35 wires to the Freight Savers account totaling $495,225.82, some of which included were late fees.

27. Between September 2006 and September 2008, Palasy and IMMERGLUCK continued to communicate by email, generally concerning the outstanding balances on the shipping invoices.  On or about February 7, 2007, IMMERGLUCK emailed

the following to Palasy:

> Jack, As of last night, we still haven't
> received the 8K.  We need to set up a weekly
> payment time because I shouldn't have to keep
> checking with you to see if the money has
> been sent.  Since your shipping volume has
> exploded, we need to build up the deposit you
> currently have with us.  As we discussed in
> the being (?beginning?) we would like to have
> a two weeks worth of deposit in addition to
> our invoices being paid within 7 days.  The
> partners are getting uncomfortable with our
> current deposit which is currently $4708.57.
> That is about half of what you are currenty
> spending a week.  What the partners in the
> company would like is for us to have a 23k
> deposit on hand at all time with each invoice
> being paid in full within 7 days.

28. On or about February 8, 2007, Palasy sent an email to
IMMERGLUCK confirming a wire transfer to Freight Savers in
the amount of $20,000; on or about February 19, 2007, there
was another email, confirming another $20,000 wire transfer
to Freight Savers; and on March 12, 2007, IMMERGLUCK
acknowledged a third wire payment, this one for $25,000.

29. On April 11, 2007, Palasy emailed IMMERGLUCK with contact
information for two new pharmacies in Tennessee: River City
RX and Northside Drugs. Palasy requested that IMMERGLUCK
"please set the dayly schedule for those 2 pharmacies please
ahd let me know [.] do not share this contacs please with
not one[.]"  IMMERGLUCK responded by writing, "Jack, I need
a contact person at each pharmacy, also what time they need
a pickup to be made everyday and what time they close."

16

Palasy replied with the information.

30. During the course of this investigation, I reviewed transcripts of online chats between IMMERGLUCK and others. These online chats were conducted using a software called Skype. Skype allows users to communicate by telephone and by Instant Messaging (IM) via computer. On April 12, 2007, IMMERGLUCK communicated by Skype IM with a person identified online as "SP" regarding Palasy. IMMERGLUCK's online identifier was "DHL - Steven IMMERGLUCK". The IM conversation proceeded as follows:

| | |
|---|---|
| IMMERGLUCK: | [Jack] shipped a little yesterday and I'm setting up 2 more pharmacies today for him |
| SP: | rumor is he is spending a lot of money on himself, new Boat, home, gambling, etc |
| IMMERGLUCK: | i'm heard that too |
| SP: | Who are the Pharms? |
| IMMERGLUCK: | please keep them to yourself, he ask me not to tell anyone<br>River city rx in memphis<br>northside drugs in jackson, tn<br>You know them? |
| SP: | absolutely ... I will also let u know if they ever get on the DEA rador as well. With Jack I alwasy need to watch him like hawk.<br>Are these Pharms shipping for other OLP's |
| IMMERGLUCK: | not that I know of<br>Are they a good pharmacy |
| SP: | How did you find them then, just curious?<br>No I do not know them, I will check our records here though, and let you know. |

17

IMMERGLUCK:     jack found them

31.   Thereafter, on April 19, 2007, IMMERGLUCK emailed Palasy
      saying, "Jack, I'm noticing a ton of shipments being
      generated for River City Pharmacy but I don't see any of
      them going out?  Is there a problem with them?"  By April
      25, 2007, IMMERGLUCK reported that shipments were missing
      from River City RX.  The next day, April 26, 2007 at 10:27
      AM, IMMERGLUCK emailed Palasy to say, "I happy to say that
      DHL has recovered the majority of the stolen packages, only
      10 packages of the original 107 are still outstanding."

32.   On April 26, 2007, at 4:29 PM, Palasy sent an email to
      IMMERGLUCK regarding the Tennessee investigation referred to
      in Paragraph 18 of this Affidavit.  The text of the email
      said, "read this [.] jack [.]" There was one attachment to
      the email, labeled "carta tennessi.pdf."  The attachment
      consisted of a DHL label to a customer in New Orleans,
      Louisiana, with a return address of River City RX in
      Memphis, Tennessee.  Along with the label, there was the
      first page of a letter from the Tennessee Bureau of
      Investigation, which advised the customer, among other
      things, that it was conducting an investigation concerning
      an Internet pharmacy "mail out scheme."  It further advised
      the customer that, "Upon receipt of this delivered package
      you would have received a prescription for a controlled

18

substance," and that "it is illegal to receive a prescription for a controlled substance without the establishment of a legitimate doctor/patient relationship, and it is unlikely for such relationship to exist through Internet correspondence alone."  The letter further advised the customer that using the Internet to facilitate the illegal sale of a controlled substance would be in violation of 21 U.S.C. 843(b), which is punishable by a term of imprisonment of not more than five years and a fine of not more than $30,000.  It stated that this statute could apply to "owners of Internet sites, prescribers, pharmacies, and you the patient/consumer."

33.  On May 4, 2007, IMMERGLUCK had another Skype IM conversation with "SP" regarding Palasy's online pharmacy business.  The conversation proceeded as follows:

IMMERGLUCK:      I heard Jack may be in trouble.  Andy didn't
                 give me the spefics but he may be shut down
                 soon.

SP:              why?

IMMERGLUCK:      I heard that guy who called a few months back
                 is causing trouble again
                 Andy didn't give me many details
                             but I know last week the TN
                 bureau of investigation confiscated 110
                 medication and put a letter in each package
                 to his customers
                 did you hear about that?

At this point, the Skype transcript indicates that IMMERGLUCK then sent file "carta tennessi.pdf," to SP which,

as described in Paragraph 32 of this Affidavit, advised customers of illegality of the online prescriptions they were receiving as well as the criminal penalties.

34. Despite receiving a copy of the Tennessee Bureau of Investigations letter, IMMERGLUCK continued to ship prescription medications ordered through Global Access and other illegal online pharmacies after April 2007, and received payment for them.  An invoice dated August 12, 2008 shows a delivery of 11 packages, 8 of which were from Meetinghouse, for a charge of $194.92.

35. Based on the above information, I have probable cause to believe that Steven IMMERGLUCK entered into an agreement with, among others, Jack Palasy, operator of Global Access, S.A., and Baldwin Ihenacho, owner of Meetinghouse Community Pharmacy, to facilitate and ship controlled substances which were ordered through a known illegal online pharmacy and Internet websites operated by Global Access and dispensed by Meetinghouse Community Pharmacy without valid prescriptions to customers across the country. I therefore have probable cause to believe that Steven  IMMERGLUCK knowingly and intentionally conspired to distribute controlled substances, in violation of Title 21, United States Code, Section 846.

36. Based on the above, I respectfully request that a Criminal Complaint be issued charging that STEVEN IMMERGLUCK

knowingly and intentionally conspired to possess controlled

substances, with intent to distribute, in violation of Title

21, United States Code, Section 846.

ANTHONY J. ROBERTO
Special Agent
U.S. Drug Enforcement
Administration

Sworn to me and subscribed in my presence this ___ day of
December, 2009.

LEO T. SOROKIN
United States Magistrate Judge

21